**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0083n.06
Filed: January 28, 2008

**No. 06-4664**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| SANDRA E. CONLEY, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| CITY OF FINDLAY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

_____

BEFORE:   MOORE and GRIFFIN, Circuit Judges; and TARNOW, District Judge.[*]

GRIFFIN, Circuit Judge.

In the aftermath of a massive spill of 500,000 gallons of wastewater from its municipal Water Pollution Control Plant, defendant City of Findlay terminated plaintiff Sandra Conley's employment as an assistant operator at the plant. Thereafter, Conley sued the City claiming sex discrimination, the creation of a hostile work environment, and unlawful retaliation. The district court granted summary judgment in favor of the City, and Conley appealed. We affirm. In doing so, we hold that Conley failed to rebut, as pretextual, the City's legitimate and nondiscriminatory reasons for

_____

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

terminating her employment. Further, we hold that Conley failed to establish a genuine issue of material fact regarding her claims of hostile work environment or unlawful retaliation.

I.

Beginning in February 1997, Sandra Conley worked the third shift as an assistant operator at defendant's Water Pollution Control Plant in Findlay, Ohio. Some of her specific duties included: operating belt filter presses, *monitoring liquid levels from the sludge holding tanks*, reading and recording charts and gauges, collecting samples for analysis, and performing "unskilled duties such as mowing, landscaping, sweeping, moping [sic], dusting, painting and cleaning windows." An assistant operator must also "assist a plant operator in any process problems that may occur," and perform "[a]ny other duties as required to maintain proper operation of the facility."

In February 2004, Conley was involved in an overflow of a sludge tank. She admitted that she "knew that the waste had been on a little bit longer than it should, but I didn't know it was overflowed until the next day." She claims that there was some discussion about whether she had caused the overflow or whether it was caused by a malfunctioning clarifier tank. Regardless, part of her duties involved manually checking the level of the tanks throughout her shift, and she admits that she did not recheck the levels after her initial check. Dave Beach, the plant supervisor, informed her of the problems caused by spills of this nature, and she was verbally reprimanded for her role in the overflow.

On March 31, 2004, Conley was responsible for a second spill. This spill was the largest in City history, resulting in the discharge of over 500,000 gallons of wastewater.

Conley claims that when she began her shift on March 31, 2004, at 4 p.m., she spoke with Gary Hayden, the assistant operator of the outgoing shift, but he did not mention to her that the waste flow machinery was in operation. According to Conley, "[i]t was customary for the previous shift's assistant operator to notify the oncoming assistant operator if he had left the waste on." Further, Conley asserts that it was also customary to place a magnetic placard on the control panel to signify that the "waste was on." Hayden did not mention that he had activated the waste machinery, and there was no placard, so Conley "assumed that the tanks had been filled and that wasting had been completed."

She checked the level of the tanks at the beginning of her shift, "but not after that, because she had no reason to think that wasting was being performed." She did not check the control panel until several hours later, during a discussion with Werner Roesch, the operator on duty during her shift, at which point she realized that the machinery had been active during her entire shift and that there had been an overflow. In her brief, Conley blames Roesch for the overflow. She argues that the "overflow should have been caught by operator Roesch in the control room before it reached catastrophic proportions, had he been doing his job properly. Had he been monitoring his computer monitor, he would have seen that the waste had been on for a significant length of time and could have alerted [Conley]." During her deposition, Conley argued that the spill was Roesch's fault, but admitted that she shared in the blame:

Q.      [Counsel for City]  How did the spill occur?

A.      [Conley]  Because the waste was still on and I didn't know it.  I looked at the panel and I didn't see that the one switch was on.  I looked for warning lights and didn't see that.

Q.      Is it fair for me to say that you just overlooked that?

A.      Yes, sir.  And that would have – yes, yes, sir.

Q.      That resulted in a significant spill, didn't it?

A.      That along with the fact that the operator wasn't watching his monitors to see that the waste had been on that long.  That is – had he done that – either way, had I seen, okay, that it was on, I would have shut it off.  Or if he had been monitoring his computer monitor, he would have seen that the waste had been on for a significant length of time and could have alerted me.

Q.      Whose job is it to make that determination?

A.      Well, it's his job to monitor it, the plant.

Q.      Okay.  It's his job to monitor the plant.  You stated in –

A.      And it was a mistake.

Q.      You made a mistake because you overlooked –

A.      I accidentally overlooked it.  I looked and didn't see it.

In her incident report for the March 31 spill, Conley wrote that the overflow was only 50,500 gallons.  Conley claims that Roesch told her to specify approximately 50,000 gallons in her report as an estimate of the overflow, rather than the actual 500,000 gallons.

Roesch told his superiors about his role in the spill and the falsehood contained in the report.  After an investigation of the spill, Roesch was given a five-day suspension for his actions.  Conley

suggests that Roesch was part of a conspiracy to place all of the blame on her. Nevertheless, by

Conley's own admission, it was her duty to accurately record the amount of spillages.

While the second spill was being investigated, Conley was responsible for a third spill. This

was a minor spill, consisting of only one gallon of wastewater. Conley testified in her deposition

that on April 7 she was in the process of checking to make sure that the tank was not overfilling, but

that she "just got there a couple minutes too late."

The City terminated Conley's employment on May 20, 2004. In its termination notice to

plaintiff, defendant listed four reasons for its action:

1. **Incompetence [pattern of conduct]**, in that you have engaged in a pattern of conduct that, despite training, resulted in three tank overflow incidents within three months [February, March and April 2004], including a single egregious act. That egregious act was a nearly catastrophic spill that could have resulted in direct transmission of biosolids into the Blanchard River, with the potential to endanger aquatic life in the environment of the River.

2. **Nonfeasance**, in that your failure to prevent the March 31, 2004, discharge caused biosolids to enter into the stormwater drainage system, which could have caused extensive environmental damage to the aquatic life of the River, and could have exposed the City of Findlay to sizable Environmental Protection Agency fines. Two other incidents of nonfeasance occurred. [one in February 2004; and one in April 2004]. Both resulted in tank overflow which flooded the Sludge Pump Building.

3. **Negligence** concerning inattention to procedures for wasting sludge which could have had adverse effects on the environment and further exposed the City to liability for fines and other EPA-mandated corrective action.

4. **Dishonesty**, in that you recorded a false supernating number on the General Operation Record, a public record, on March 31, 2004, indicating that you performed supernating procedures that you had not performed. You did this by writing on the Operation Record a supernating number in gallons that

could not have been possible; and that you attempted to involve the on-duty Operator in the deception.

Conley appealed her termination to the Civil Service Commission and thereafter sued the City in the United States District Court for the Northern District of Ohio, Western Division. Her suit claimed: (1) discrimination based on sex in violation of Title VII, OHIO REV. CODE § 4112.02, and 42 U.S.C. § 1983, (2) creation of a hostile work environment, and (3) retaliation against her in violation of 42 U.S.C. § 1983. The district court granted summary judgment in favor of defendant on all counts. Conley timely appealed.

## II.

This court reviews a district court's grant of a motion for summary judgment de novo. *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 374 (6th Cir. 2007). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Thus, only disputed material facts, those "that might affect the outcome of the suit under the governing law," will forestall summary judgment. *Id.* at 248. Once the movant has met its burden, the nonmoving party must present "significant

probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When determining whether the nonmovant has met this burden, the court must view the evidence in the light most favorable to the nonmoving party. *Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007).

III.

Conley claims that the City discriminated against her on the basis of her sex. It is a violation of Title VII of the Civil Rights Act of 1964 "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Conley also claims sex discrimination in violation of OHIO REV. CODE § 4112.02. The Ohio Supreme Court has held that the analysis used to evaluate claims under § 4112.02 is identical to the analysis used for Title VII. *See Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 575 N.E.2d 1164, 1167 (Ohio 1991). Thus, we review these two claims together.

Because plaintiff does not claim to possess direct evidence of sex discrimination, we must determine whether she presented sufficient circumstantial evidence to overcome defendant's motion for summary judgment. The parties agree that the analysis of this legal issue is governed by the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of unlawful discrimination under Title VII. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006).

Once the plaintiff has made such a showing, the burden of production shifts to the defendant to present a legitimate, nondiscriminatory basis for the adverse employment action. *Id*. This explanation must be "legally sufficient to justify a judgment for the defendant." *Id*. (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)). If the defendant meets its burden, the plaintiff must show that the proffered reason was a pretext for unlawful discrimination. *Id*. at 706-07. "Throughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate." *Id*. at 707 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

The City concedes that Conley established a prima facie case,[1] so the burden shifts to the City to demonstrate a legitimate, nondiscriminatory basis for discharging Conley. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Wright*, 455 F.3d at 706. In terminating Conley's employment, the City asserted four reasons for its action: incompetence, nonfeasance, negligence, and dishonesty. These are legitimate, nondiscriminatory reasons sufficient for defendant to satisfy its burden under the second prong of *McDonnell Douglas*. On appeal, Conley admits that she was responsible for the three wastewater spills, but contends that the City's reasons were pretextual.

An employee overcomes an employer's claim that it had a legitimate, nondiscriminatory reason for the termination by showing that the proffered reason was pretextual. *Macy v. Hopkins Cty. Sch. Bd. of Ed.*, 484 F.3d 357, 366 (6th Cir. 2007) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). There are three ways that a plaintiff can demonstrate that

---

[1]This is a generous concession based on this record.

the employer's claim was pretextual: (1) by showing that the reason has no basis in fact, (2) by showing that the employer was not actually motivated by its proffered reason, or (3) by showing that the proffered reason was insufficient to motivate the termination. *Id*.

In her brief, Conley attacks the factual basis for her discharge by disputing her role in the spills and argues that this precludes summary judgment by creating a genuine issue of material fact. She argues that the first spill may not have been caused by her negligence because there might have been a malfunctioning clarifier tank.

She also disputes her role in the massive spill of March 31, 2004:

> The primary reason for the large spill was not any carelessness on the part of Appellant, but was because the prior shift's assistant operator, completely contrary to normal practice, had started the waste operation without informing Appellant, and without placing a magnetic warning placard that was normally placed during waste operations. Because of this, Appellant had no reason to suspect that waste operations might be in progress, and hence to be concerned about an overflow.

Regarding the second spill, Conley admits that she checked the level of the wastewater in the tank at the beginning of her shift but did not check it again until after the spill. Further, she concedes that she did not check the control panel until she had a discussion with Roesch that led her to realize that there had been a spill. Conley argues that her fault, if any, in the spills is a factual issue that should be decided by the trier of fact.

Also, Conley argues that the third spill is an insufficient basis to terminate her employment because the spill was "minimal in quantity" and such spills were not uncommon at the plant. However, the City did not discharge plaintiff because of the third spill, only. Rather, defendant terminated Conley's employment because of her unacceptable job performance in all three spills.

Conley insists that her sex was a motivating factor in her termination because she and Roesch received different punishments for their actions in the massive March 31st spill; Conley was ultimately dismissed (after causing the third spill), whereas Roesch was merely suspended for five days. However, disparate treatment of employees who are not similarly situated does not establish that the City's proffered reasons for termination were pretextual. Roesch and Conley had different job responsibilities and played different roles in the March 31st spill. Moreover, Roesch confessed his role in the false report and for the spill, while Conley refused to accept responsibility. Further, Conley received a prior reprimand for the first spill and caused a third spill while the second spill was being investigated. As the district court noted, "[a]n employer may discipline one party who it views more culpable with harsher sanctions than an employee it views as less culpable."

In her argument, plaintiff is confusing the first prong of *McDonnell Douglas* with its third-prong analysis. Establishing that similarly-situated employees (Roesch and Conley are not) are treated differently may be sufficient circumstantial evidence for a plaintiff to establish a prima facie case of sex discrimination. However, disparate treatment does not factually rebut the legitimate and nondiscriminatory reasons given for plaintiff's discharge. Irrespective of whether others could or should have been disciplined more harshly, plaintiff has not factually rebutted that her incompetence, nonfeasance, negligence, and dishonesty warranted her termination. Plaintiff has not sustained her burden of establishing a genuine issue of material fact that her job performance was satisfactory. The *three* sewage spills for which plaintiff was responsible were not a pretext created by defendant.

Next, Conley argues that she was treated differently from male employees at other times and recites a litany of accusations against the City and a number of her co-workers. She claims that she was not automatically given a standard uniform and had to ask for one. Also, she asserts that operators made false accusations about her and leveled unwarranted complaints. She claims that whenever someone reported that she was not performing a task correctly, her supervisor would make her perform it while he watched – much to her embarrassment. Presumably she offers these incidents as possible alternative motives for her firing. But none of these complaints, even if assumed to be true, demonstrate that the City's reason for terminating Conley lacked a factual basis, failed to motivate its decision to terminate her, or were insufficient to motivate her discharge. When viewed in the light most favorable to her, Conley has shown that some of her co-workers engaged in activities that ranged from rude to inappropriate, but she has not shown that the City's proffered reason for its action was pretextual.

In opposing the City's motion for summary judgment, Conley submitted an affidavit of Joseph Sharrer, who served as an assistant operator at the plant from May 2001 through July 2002. In his affidavit, Sharrer described a previous spill that occurred while Roesch was an assistant operator. According to Sharrer, he was "not aware that [Roesch] was ever suspended or otherwise disciplined for that spill." Further, Sharrer claims in his affidavit that after the March 31, 2004, spill, Roesch called and told him that Roesch had entered into an oral agreement in which he would place the blame on Conley for the spill in exchange for his five-day suspension. The parties dispute the

admissibility of this affidavit. The City claims that the affidavit is not admissible documentary evidence because it is not based on personal knowledge and contains hearsay within hearsay.

Assuming, without deciding, the admissibility of this affidavit or portions thereof, we nonetheless hold that Conley has not sustained her burden of demonstrating that the City's legitimate, nondiscriminatory reasons for terminating her employment were pretextual. Sharrer's lack of knowledge regarding whether Roesch was disciplined for a previous and unrelated spill is not material. As previously noted, speculation regarding disparate treatment of other employees for non-similar incidents does not establish pretext. Moreover, Sharrer's allegations of a "deal" with Roesch in which Roesch would receive a five-day suspension only, in exchange for his statement, is not evidence of discrimination based on sex, or evidence that the City's decision to terminate Conley's employment for causing three spills was a pretext for sex discrimination. On this record, no reasonable juror could conclude otherwise, and therefore summary judgment was appropriately granted in favor of defendants. *See*, *e.g.*, *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) ("the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual); *see also Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007) ("the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination."); *Macy v. Hopkins Cty. Sch. Bd. Of Educ.*, 484 F.3d 357, 371 (6th Cir. 2007) (same); *Murray Guard, Inc.*, 455 F.3d at 713 ("the ultimate question at summary judgment on a mixed-motive case is 'whether the plaintiff has presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that

[a protected characteristic] was *a motivating factor* in [the defendant's adverse employment action against the plaintiff].'") (quoting *Harris v. Giant Eagle, Inc.*, 133 F. App'x 288, 297 (6th Cir. 2005) (unpublished) (internal quotation marks omitted) (alteration in original)).

IV.

Next, Conley claims that the City created a hostile work environment based on sexual harassment. Plaintiff alleges that she was treated differently from her male colleagues and repeats many of her sex discrimination arguments. For purposes of claiming a hostile work environment, Conley claims that she was treated differently in the following ways: she was told not to study for the EPA exam on duty, but her male co-workers could study for the exam during their downtime; her previous operator (Mark Steers) was told not to teach her how to perform his job; her supervisor (David Beach), in attempting to verify that a male assistant operator knew how to do his duties, did so in a non-embarrassing way, but he verified Conley's job performance in a manner designed to embarrass her; male assistant operators were allowed to do some jobs in particular ways that Conley was not allowed to do; and two male assistant operators responsible for spills were not suspended. Conley does not allege that any particular act, standing alone, was severe, but claims that the cumulative effect was pervasive.

Sex-based discrimination that creates a hostile or abusive work environment is a violation of Title VII. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). A hostile work environment exists when the workplace "is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citation and quotation marks omitted). The harassment must meet both an objective and a subjective test, "in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." *Randolph v. Ohio Dep't of Youth Svcs.*, 453 F.3d 724, 733 (6th Cir. 2006); *see also Harris*, 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview"); *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 352 (6th Cir. 2005) ("Title VII was not meant to create a 'general civility code'") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Courts are required to consider the totality of the circumstances when reviewing the allegations of harassment to determine if they are severe or pervasive enough to establish a hostile work environment. *Harris*, 510 U.S. at 23; *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). "This totality-of-circumstances examination should be viewed as the most basic tenet of the hostile-work-environment cause of action." *Williams*, 187 F.3d at 563. Thus, the court must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. *See also Williams*, 187 F.3d at 560-62 (adopting the *Harris* standard). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. Consequently, "simple teasing, . . . offhand

comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id*. (internal citation and quotation marks omitted). "[A] work environment viewed as a whole may satisfy the legal definition of an abusive work environment, for purposes of a hostile environment claim, even though no single episode crosses the Title VII threshold." *Williams*, 187 F.3d at 564.

In order to successfully bring a claim for sexual harassment based upon the creation of a hostile work environment, an employee must establish five elements: (1) the employee is a member of a protected class, (2) the employee was subject to unwelcomed sexual harassment, (3) the harassment complained of was based on sex, (4) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive work environment, and (5) the existence of respondeat superior liability. *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir. 1996). The City has only challenged the second and third elements.

It is not clear that these allegations, when viewed with the totality of the circumstances, amount to unwanted sexual harassment. Moreover, even if they did, Conley has failed to establish that the "harassment complained of was based on sex."

Conley admits that she was not the target of overtly sexual behavior, but argues that non-sexual behavior may give rise to the creation of a hostile work environment. We agree. In *Williams*, we held that "harassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the 'based on sex' requirement." 187 F.3d at 565.

The *Williams* court explained that a plaintiff could demonstrate the presence of such animus by showing that "but for the fact of her sex, she would not have been the object of harassment." *Id*. (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982)).

In the present case, however, even if the court accepts all of Conley's assertions as true, she has not shown that these actions were motivated by any sort of sexual animus. The district court noted that "[s]ome of [Conley's] complaints constitute personality conflicts with certain employees who 'refused to talk to her' or 'made false reports about her,' but not a hostile work environment or discriminatory animus based on sex." Conley states in her brief that she "believes that the spills were not the real reason she was terminated, but rather that persons have been wanting her out of the plant for a long time, and the spills provided the method for doing so." She alleges that "persons" wanted to get rid of her, but does not allege that they were motivated by her sex. Without evidence that she was harassed either in a sexually explicit manner, or specifically because of her sex, Conley cannot obtain relief under Title VII.

When viewing the totality-of-circumstances surrounding Conley's allegations of sexual harassment, and her inability to show motivation by sexual animus, we conclude that the district court properly granted summary judgment in favor of the City regarding her allegations of a hostile work environment.

V.

Finally, Conley argues that the district court erred by not recognizing that a genuine issue of material fact exists that precludes summary judgment on her retaliation claim. To establish a claim

for retaliation under 42 U.S.C. § 1983,[2] a plaintiff must prove the following elements: "'(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two–that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.'" *Sowards v. Loudon County*, 203 F.3d 426, 431 (6th Cir. 2000) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).

After stating the relevant legal standard, Conley's entire retaliation argument is dedicated to challenging the district court's conclusion that an employer may discipline an employee that it views as being more culpable in a harsher manner than it disciplines an employee that it deems to be less culpable. Conley argues that relative culpability is "a matter that only the jury, not the District Court, can determine." Conley's brief makes no effort to establish the elements of the claim.

The district court ruled that Conley failed to establish a causal link between the filing of her complaint with the Civil Service Commission and her termination.[3] We agree. Conley may be correct that the relative culpability of each employee is unknown, but without making some showing

---

[2]OHIO REV. CODE § 4112.02 uses the same retaliation standard as 42 U.S.C. § 1983. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("In analyzing retaliatory discharge claims, the Ohio courts rely on federal caselaw.") (citing *Peterson v. Buckeye Steel Casings*, 729 N.E.2d 813, 821-22 (Ohio Ct. App. 1999)). Thus, these two claims will be considered together.

[3]This is somewhat confusing because under the *Sowards* test, a causal connection is a required element of the plaintiff's prima facie case. 203 F.3d at 431. The district court must have meant that plaintiff established a prima facie showing of the first two elements of that test: that she engaged in protected conduct, and that she was the subject of an adverse action.

that there is a causal link between the filing of her complaint with the Civil Service Commission and her termination, she has failed to establish the requisite elements of a retaliation claim and therefore cannot survive summary judgment.

VI.

For the reasons stated above, we affirm the judgment of the district court granting summary judgment in favor of defendant on all claims.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** I believe that had the district court considered the Sharrer affidavit, which alleges that Roesch received only a five-day suspension in exchange for his promise to place upon Conley the blame for the spill, Conley would have established pretext. Under these circumstances, I respectfully disagree with my colleagues and dissent.

Because I believe that the majority is too quick to conclude that Conley would have failed to establish pretext on the part of the City of Findlay, it cannot suffice simply to assume without deciding that the Sharrer affidavit should have been considered; we must address the admissibility of the affidavit. Our case law is quite clear that the district court should have considered the Sharrer affidavit, as it was not inadmissible hearsay. The parts of Sharrer's affidavit detailing Roesch's allegations are admissible under Federal Rule of Evidence 801(d)(2) as an admission by a party-opponent. The rule states that a statement is not hearsay if "[t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." FED. R. EVID. 801(d)(2)(D). Sharrer's affidavit regarding Roesch's statements fits that description.

The person whose employment must meet the constricts of Rule 801(d)(2)(D) is Roesch, not Sharrer. For instance, in *Gold v. FedEx Freight East, Inc.* (*In re Rodriguez*), 487 F.3d 1001 (6th Cir. 2007), we looked at the employment status of the *out-of-court declarant* to determine whether the out-of-court declarant, not the one who made out the affidavit, made the statements during the course of his employment. *See id.* at 1008 ("FedEx is incorrect, at least with regard to the McKibbon and

Williams affidavits, which are admissible non-hearsay. Adkinson's statements concerning Rodriguez's accent and speech pattern, as recounted in those affidavits, were allegedly made during Adkinson's employment with FedEx, to a lower-level supervisor who otherwise would have promoted Rodriguez, and in response to a direct inquiry from another manager regarding the reason for Adkinson's refusal to promote Rodriguez. It is clear, therefore, that Adkinson made the alleged statements during the course and in the scope of his employment with FedEx."). In other cases we have applied Rule 801(d)(2)(D) in the same manner. *See, e.g.*, *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999) (focusing on the employment status of the out-of-court declarant, but concluding for other reasons that the statements did not qualify as non-hearsay under Fed. R. Evid. 801(d)(2)(D)); *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1081 (6th Cir. 1999) (focusing on the employment status of the declarants whom the plaintiff's witness quoted, not the employment status of the plaintiff's witness).

In considering whether Roesch qualifies under Rule 801(d)(2)(D), I note that it is undisputed that Roesch was an employee at the time he made the statement to Sharrer; therefore, the remaining question is whether the statement was made within the scope of Roesch's employment. We have one opinion that defines "scope of employment" in a seemingly narrow manner, stating that "[t]here is a critical difference between making a statement while one is an employee and having the actual or implied authority to make such a statement on behalf of your employer." *Jacklyn*, 176 F.3d at 928. Our application of that standard, however, was not so narrow; we looked at the authority the declarant had over the matter he was addressing and concluded that because the declarant "was not

involved in the actions that plaintiff claims led to her constructive discharge[,] his statements did not

concern matters within the scope of his agency or employment." *Id.* Therefore, *Jacklyn* is consistent

with our precedents that consider the authority of the declarant. *See, e.g.*, *Blair v. Henry Filters, Inc.*,

505 F.3d 517, 528 (6th Cir. 2007) (concluding "that the preponderance of evidence indicates that

Tsolis[, the declarant,] had the authority to hire and fire salespeople, and therfore, Tsolis's 'younger

sales force' statement concerned a matter within the scope of his employment"); *Johnson v. Kroger*

*Co.*, 319 F.3d 858, 868 (6th Cir. 2003) ("Although remarks made by an individual who has no

authority over the challenged employment action are not indicative of discriminatory intent, the

statements of managerial-level employees who have the ability to influence a personnel decision are

relevant."); *Liadis v. Sears, Roebuck & Co.*, 47 F. App'x 295, 303 (6th Cir. 2002) (unpublished)

("Statements by employees are outside of the scope of an employee's employment, and therefore not

subject to the party-admission rule, when they concern decisionmaking processes into which the

employee has no input, or decisions to which they were not a party."); *Moore*, 171 F.3d at 1081

(concluding that statements were non-hearsay because one was made by an employee in a

supervisory capacity and the other was made at the direction of the supervisor, thus giving the

declarant agent status).

I must conclude that Roesch, as operator and supervisor of the assistant operators, was in a

position both to supervise Conley's work and to critique her performance. *See* J.A. at 236-244.

Therefore, if Roesch admitted that he lied in Conley's performance evaluations at the request of his

superiors, that would be a statement within the scope of his employment. For that reason, the Sharrer affidavit should qualify as non-hearsay under Rule 801(d)(2)(D).

If the district court should have considered Sharrer's affidavit, and I believe it should have, then the final question we must address is whether the affidavit would have satisfied Conley's obligation to demonstrate pretext and rebut the city's explanation for why it fired her. Although this is a close question, I believe that the affidavit does establish pretext. Because Conley appeals the district court's grant of summary judgment, we must view the affidavit in the light most favorable to Conley, the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, any inferences that can be drawn from the Sharrer affidavit must be viewed in the light most favorable to Conley. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Judged in that light, we must reverse the grant of summary judgment if the affidavit provides evidence from which "a reasonable jury could conclude that the proferred reason is actually a pretext for unlawful discrimination." *Blair*, 505 F.3d at 524.

One of the ways that a plaintiff may demonstrate pretext is by showing that the proferred reason "did not actually motivate the defendant's challenged conduct." *Id.* at 532. If we take Sharrer's affidavit in the light most favorable to Conley, a reasonable jury could certainly conclude that the City of Findlay's proferred reason for firing her was pretextual. What the affidavit shows was that Conley was specifically targeted by her employers, who wanted to remove her so badly that they were willing to lie in order to stack the deck against her. The city's claims that it fired her for incompetence might very well ring hollow for a jury that believes that the city acted with animus

against the only woman working at the Water Pollution Control Plant. In other words, if the City of Findlay truly believed that Conley was incompetent, directing employees to falsify her performance reviews would be unnecessary; in contrast, the falsification of her performance review "casts further doubt on the legitimacy of [the City of Findlay's] stated reason." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713 (6th Cir. 2007). Thus, the Sharrer affidavit established pretext and summary judgment was inappropriate.

Given Conley's apparent role in the largest spill in the history of the City of Findlay, I am certainly skeptical of her chances of success at trial. My own skepticism, however, is not cause for ignoring the fact that she has rebutted the city's assertions and demonstrated pretext. The decision should properly be left to a jury, not judges, to assess the evidence and decide whether Conley was in fact the victim of discrimination. Under these circumstances, I think that we should reverse the district court's grant of summary judgment, and for that reason, I respectfully dissent.