**Wayne L. MARSHALL, Plaintiff,**

v.

**GRAND TRUNK WESTERN RAILROAD COMPANY, Defendant.**

Case No. 1:09–cv–754.

United States District Court, W.D. Michigan, Southern Division.

May 9, 2011.

Laurence C. Acker, Robert E. Harrington, III, Robert B. Thompson, Harrington Thompson Acker & Harrington, Chicago, IL, for Plaintiff.

Mary C. O'Donnell, Gregory Clifton, Durkin McDonnell Clifton & O'Donnell PC, Detroit, MI, for Defendant.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON FELA LIABILITY

PAUL L. MALONEY, Chief Judge.

### INTRODUCTION

This is an action under the Federal Employers Liability Act, 45 U.S.C. § 51 *et seq.* ("FELA"), which the parties agree is plaintiff Wayne L. Marshall ("Marshall")'s sole remedy for on-duty injuries allegedly sustained during the course of his employment with defendant Grand Trunk Western Railroad Company ("the railroad"). Marshall seeks FELA damages for injuries allegedly sustained in four accidents which occurred in February 2006, January 2007, September 2007, and December 2007, and he alleges that each of those accidents was at least "a cause" of his medical conditions and three concomitant surgeries: April 2008 left-knee surgery by Dr. Kokmeyer, October 2008 right-knee replacement by Dr. Thomas, and February 2009 left-knee replacement again by Dr. Thomas. Marshall seems to allege that he had back "surgery", *see* Plaintiff's Motion for Summary Judgment on FELA Liability filed December 2010 ("P's MSJ") at 2, but the railroad clarifies that he merely had a permanent stimulator implanted in his back in November 2009, which it does not characterize as surgery, *see* Defendant's Brief in Opposition to Motion for Summary Judgment on FELA Liability filed February 3, 2011 ("Def's Opp") at 8 n. 11 (citing Marshall's March 4, 2010 Dep. (P's MSJ Ex. 1) at 24).

It is undisputed that under FELA's relaxed causation requirement, Marshall need not prove that the railroad's negligence was the proximate, sole, or primary cause of his injuries, only that his injuries resulted "in part" from its negligence. In turn, Marshall can establish the railroad's negligence *per se* by showing that it violated any provision of the Federal Safety Appliance Act, 49 U.S.C. § 20301 *et seq.* ("FSAA") and the regulations which the United States Department of Transportation ("DOT") has promulgated thereunder (namely portions of 49 C.F.R. §§ 213, 231, and 232). In addition, Marshall contends, once he establishes that the railroad violated the FSAA, the railroad will be statutorily precluded from raising the affirmative defense of contributory negligence. Therefore, Marshall urges, there is no genuine issue of material fact as to whether the railroad is liable for the injuries he sustained in four on-the-job accidents which occurred in 2006 and 2007.

If Marshall is correct about the FELA liability standard and the lack of a genuine issue as to such liability, the jury would be left to determine only the nature, extent and duration of his injuries, and the appropriate monetary compensation for those injuries. Marshall alleges that his on-the-job injuries caused him to undergo back surgery and bilateral knee-replacement surgery, but the railroad responds that he has failed to show that those injuries and treatments were occasioned by his on-the-job accidents. *See* Def's Opp. at 1.

Marshall filed a motion for summary judgment in December 2010 (Docs. 65–67), relying heavily on testimony from his eight-hour deposition and its thirty-six exhibits, *see* P's MSJ at 1 n. 1. In February 2011 the railroad filed an opposition brief (Doc. 75) and Marshall filed a reply brief (Doc. 79). The court heard oral argument on Monday, May 2, 2011. For the reasons that follow, the court will **GRANT IN**

**PART AND DENY IN PART** plaintiff Marshall's motion for summary judgment.

### BACKGROUND

*February 2006 Accident (Count 3)*

Marshall worked for the railroad from June 1971 (age 18) until December 2007 (age 54), when he allegedly became permanently disabled. *See* P's MSJ, Exhibit ("Ex") 1–Deposition of Wayne L. Marshall, Volume 1 ("Marshall Dep. 1") at 45. He was 57 years old when he filed the instant complaint. He asserts one FELA claim for each of the four on-the-job accidents. The first of the four accidents occurred on February 1, 2006, when Marshall was working on a freight crew performing switching operations in Edwardsburg, Michigan for a local company, *see* Marshall Dep. 1 at 88. While Marshall was riding on a railcar, holding its "grab irons" with his hands and planting his feet securely on the sill step (stirrup), the step collapsed, causing both his knees to strike the railcar and become injured, *see* Marshall Dep. 1 at 95–96. The railroad alleges, however, that Marshall did not miss any time at work due to this incident, *see* Def's Opp. at 2 (citing Marshall March 4, 2010 Dep. at pp. 182–183).

*January 2007 Accident (Count 1)*

On January 11, 2007, while Marshall was working on a freight train traveling from Battle Creek, Michigan to Chicago, Illinois, the train made an emergency stop at an area called "Valpo Hill" in Valparaiso, Indiana, due to a malfunction in the air-braking system, *see* Marshall Dep. 1 at 102–104 and 114–116. The railroad directed Marshall to walk up the hill along the two-mile length of the train and determine the reason for the air-braking malfunction. Marshall alleges that he called his supervisor and explained that because the ground sloped severely downwards on both sides of the track, there was no safe, suitable place for him to walk alongside the track, but the supervisor directed him to do so

anyway, *see* Marshall Dep. 1 at 119–120 and 125–126. Holding onto the side of railcars, Marshall walked nearly two miles looking for the cause of the brake malfunction, continually sliding and slipping down the allegedly steep hill; between the 99th and 100th railcars, he found the problem, *see* Marshall Dep. 1 at 116–117 and 122–125. He noticed that a strap which held the air hose connecting the air supply from one car to the next car, had broken and fallen down, continually striking the ground as the train traveled. That caused the air hoses connecting the braking system to break apart, triggering a loss of air to the rest of the train's brake system and causing the emergency stop. *See* Marshall Dep. 1 at 125–129. Marshall fixed the problem by reattaching the hoses and using wire to serve the function of the now-broken strap, i.e., to keep the hoses in the air and off the ground, *see* Marshall Dep. 1 at 117. He alleges, however, that because the railroad required him to walk on such steeply sloping ground for such a long distance, he immediately began to suffer pain in his back and legs, and he reported this pain to the railroad as an injury, *see* Marshall Dep. 1 at 144. The railroad agrees that Marshall missed eleven days of work right after this incident, *see* Def's Opp. at 2 (citing Marshall March 4, 2010 Dep. at p. 183).

The railroad denies, however, that the area where it required Marshall to walk that day was steep or sharply sloped. On the contrary, the railroad alleges that the ground where he walked was "quite flat [and] well maintained—hardly the menacing … hill … that plaintiff attempts to depict." Def's Opp. at 12. The railroad proffers photographs showing the area—photographs which Track Supervisory Henry Ludvigsen confirmed accurately depict the relevant area on the side of the train track in Valparaiso, Indiana, *see* Def's Opp. Ex. 6 (Ludvigsen Aff), and which Marshall agreed "looks like a por-

tion of the track that I walked", *see* Marshall March 4, 2010 Dep. at 175–76. **The court determines that if a reasonable factfinder credited the railroad's description of the Valparaiso land, as it could, it could find that even if the railroad's supervisor directed Marshall to walk for a mile or two along the tracks that day to discover the FSAA prohibited defects which caused an emergency stop, said defect did not play any role in the injuries Marshall allegedly suffered that day.**

The railroad also attempts to show that a reasonable factfinder could find that it did not violate the FSAA's air-braking regulation, and therefore that there was no FSAA violation to support Marshall's attempt to hold the railroad strictly liable under FELA under a negligence *per se* theory. *See* Def's Opp. at 13 (pointing to Marshall's deposition testimony that he did not know when the strap connecting the air hoses broke, did not know whether the broken strap caused the failure of the ordinary air-braking system and the application of the emergency brake, and did not know why the train made an unscheduled emergency stop) (citing Marshall March 4, 2010 Dep. at 114:20–22 and 114:25 through 115:unspecified line). The court need not consider this alternative defense to count one, however, because the aforementioned factual dispute regarding the slope of the land is alone enough to create a genuine issue of material fact as to whether Marshall was even injured on that day in the manner he alleges. Because the factfinder could find that Marshall was not injured on the job on that day, he is not entitled to summary judgment as to FELA liability on count one.

*The Sill–Step Accidents: September 2007 (Count 2) and February 1, 2006 (Count 3)*

While working the Battle Creek–to–Chicago route on September 13, 2007, Marshall and a locomotive engineer were assigned to drop off and pick up railcars at a yard owned by EJ & E Railway in Griffith, Indiana, which required Marshall to stand on the side of a particular car (UELX600000) as it moved through the yard as part of a train, *see* P's MSJ Ex. 2—Deposition of Wayne L. Marshall, ("Marshall Dep. 2") at 47 and 59. Marshall's hands held "grab irons" on the railcar and his feet were securely planted on a "sill step"—also known as a stirrup—which every railcar has, and he operated a handbrake after his particular car came to a stop, in order to remove it from the train, *see* Marshall Dep. 2 at 58–59 and Marshall Dep. Ex. 5. During this process, the stirrup (sill step) collapsed underneath Marshall, causing him to twist and injure his right knee. *See* Marshall Dep. 1 at 181 and Marshall Dep. 2 at 51–52; *see also* Marshall Dep. 2's Ex. 8 (photographs of broken sill step taken by the railroad). The railroad alleges, however, that Marshall did not miss any days of work right after this incident, *see* Def's Opp. at 2 (citing Marshall March 4, 2010 Dep. at p. 183).

With regard to the collapse of the sill step underneath Marshall on February 1, 2006 (count three), the railroad does not deny that the step was broken, but points to Marshall's deposition testimony that "he could have shone his flashlight on the subject equipment and seen 'in a matter of seconds' the missing bolt which plaintiff [alleges?] caused this incident", Def's Opp. at 14(citing Marshall's March 4, 2010 Dep. at 111:14 through 113:21). This "admission" by Marshall is potentially helpful to the railroad avoiding summary judgment, however, if FELA and our Circuit's FELA precedents permit a railroad employer to use an employee's alleged contributory negligence as a means of avoiding liability (rather than merely reducing damages).

That legal issue will be discussed towards the end of this opinion.

With regard to the second collapse of the sill step underneath Marshall, this time on September 13, 2007 (count two), the railroad states, "plaintiff admitted that photograph 8E (Page ID # 447) shows a broken stirrup with the right 'acorn missing,' consistent with his observations", Def's Opp. at 14. It is unclear how the railroad believes this statement to be potentially helpful as it seeks to avoid summary judgment on liability for injuries suffered from this incident. The railroad again does not deny that this sill step was broken, and it does not seem to argue that Marshall was contributorily negligent by failing to notice (before he stepped on the sill step) that it had a missing right "acorn."

### December 2007 Accident (Count 4)

The fourth and final accident occurred on December 13, 2007, when Marshall was working a local switching job near Kalamazoo, Michigan, a task which involved moving railcars to line up for repair work to be done the next day at the railroad's Kilgore Railyard, see Marshall Dep. 2 at 89–104 and Marshall Dep. Ex. 13. To line up the railcars, Marshall needed to operate a railroad ground switch called the KK11/12 Switch on a mainline track which eventually led into the Kilgore Yard; by moving the ground switch, one moved steel track from one direction into another direction to guide railcars down the appropriate tracks, in this case either onto the mainline track or into the yard. See Marshall Dep. 2 at 92 and Marshall Dep. 2's Ex. 10 (diagram of track layout in Kilgore Yard). Marshall proffers photographs which show "obvious ice formations where [he] was required to stand" to operate the KK11/12 ground switch, see Marshall Dep. 2 at 93 and Marshall Dep. 2's Ex. 11. Marshall approached the ground switch, took hold of its handle, and began trying to move the

handle to control the movement of the track. While doing so, however, Marshall's right leg slipped on ice, injuring his left leg and left knee, and an ambulance took him to the hospital. See Marshall Dep. 2 at 95, 113–114 and 117 and Marshall Dep. 2's Ex. 13 at lines 48–49. Marshall alleges that his slip and fall and the resulting injury were caused by the railroad's provision and placement of an inadequate amount of rock ballast at the location of the KK11/12 ground switch, see P's MSJ at 6.

The railroad responds that Marshall's Personal Injury Report for that date reported only that there was "ice under snow", and neither that report nor his subsequent complaint in this court alleged improper or inadequate ballasting, see Def's Opp. at 2 (citing Marshall April 22, 2010 Dep's Ex. 9 (Personal Injury Report for December 13, 2007)). Implying that Marshall is lying when he alleges that he slipped on ice that night, the railroad emphasizes that line 12 of the personal injury report form specifically asks the employee filling out the form whether the accident was caused by a defect (to which Marshall answered "yes") and then asks the employee to describe the defect (to which Marshall did not make any mention of ballast or rocks), see Def's Opp. at 15–16. The railroad seems to reason that if the site of the ground switch really was icy due to lack of ballast, Marshall would have noticed the lack of ballast given his professed familiarity with the appearance and purpose of ballast from his time in "management", see Def's Opp. at 15 and 16.

It is undisputed that since the December 13, 2007 accident, Marshall has never worked for the railroad again, whether as a freight conductor or otherwise, see Marshall Dep. 2 at 185 and Def's Opp. at 2 (citing Marshall March 4, 2010 Dep. at p. 183).

## LEGAL STANDARD: SUMMARY JUDGMENT

"Summary judgment is proper if the 'pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.'" *Portinga v. Taylor*, 2009 WL 910800, *5 (W.D.Mich. Apr. 2, 2009) (Maloney, C.J.) (quoting *Patterson v. Hudson Area Schools*, 551 F.3d 438, 444 (6th Cir.) (quoting FED. R. CIV. P. 56(c))), *cert. denied*, —— U.S. ——, 130 S.Ct. 299, 175 L.Ed.2d 136 (2009); *see also Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir.2009). *Accord Alderman v. JC Dev. Communities, LLC*, 2009 WL 2607084, *1 (Mich.App. Aug. 25, 2009) (p.c.) (P.J. Owens, Servitto, Gleicher) ("Summary disposition is proper when, upon examining the pleadings, admissions and other evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.") (citing *Brown v. Brown*, 478 Mich. 545, 739 N.W.2d 313, 316 (2007)).

The movant has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *ARS v. Boatright Enterprises, Inc.*, 602 F.Supp.2d 829, 845 (W.D.Mich.2008) (citing *Conley v. City of Findlay*, 266 Fed.Appx. 400, 404 (6th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986))). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial—e.g., if the movant is defending against a claim—"it may meet its burden merely by showing 'that there is an absence of evidence to support the moving party's case.'" *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.2009) (quoting *Celotex*, 477 U.S. at 323, 106 S.Ct.

2548), *reh'g & reh'g en banc denied* (6th Cir. Oct. 23, 2009). *See also Wilson v. Continental Dev. Co.*, 112 F.Supp.2d 648, 654 (W.D.Mich.1999) (Bell, J.) (movant "need not support its motion with affidavits or other materials 'negating' the opponent's claim"; rather, its initial burden is only to "point out to the district court that there is an absence of evidence to support the nonmoving party's case . . . .") (citing *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir.1993)), *aff'd o.b.*, No. 99–2113, 234 F.3d 1271, 2000 WL 1679477 (6th Cir. Nov. 2, 2000). *Accord Claspell v. Denso Mfg. Michigan, Inc.*, 2001 WL 1545864, *2 (Mich.App. Dec. 4, 2001) (p.c.) (P.J. O'Connell, Sawyer, Smolenski) ("That standard is exactly the same as the standard for summary disposition used under Michigan law . . . .").

■ Once the movant has met its burden, the non-movant must present "'significant probative evidence'" to demonstrate that there is more than "'some metaphysical doubt as to the material facts.'" *ARS*, 602 F.Supp.2d at 845 (citing *Conley*, 266 Fed.Appx. at 404 (quoting *Moore*, 8 F.3d at 339–40)). The non-movant may not rest on the mere allegations of his pleadings. *See Griffin v. Reznick*, 609 F.Supp.2d 695, 698 (W.D.Mich.2008) (Maloney, C.J.) (citing *inter alia*, FED. R. CIV. P. 56(e) and *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995)); *see also Transition Healthcare Assocs., Inc. v. Tri–State Health Investors, LLC*, 306 Fed.Appx. 273, 278 (6th Cir.2009); *accord Kachudas v. Invaders Self Auto Wash, Inc.*, 2009 WL 2767303, *2 (Mich.App. Sept. 1, 2009) (p.c.) (P.J. Wilder, Cavanagh, Murray) ("When the burden of proof at trial would rest on the non-moving party, the nonmovant may not rest upon mere allegations or denials in the pleadings, but must, by documentary evidence, set forth specific facts showing that there is a genuine issue for trial.")

(citing *The Healing Place at No. Oakland Ctr. v. Allstate Ins. Co.*, 277 Mich.App. 51, 744 N.W.2d 174, 177 (2007) (citing, *inter alia, Quinto v. Cross & Peters Co.*, 451 Mich. 358, 547 N.W.2d 314, 317 (1996))).[1]

If the movant puts forward evidence—such as affidavits, purported business records, purported government records, etc.—the other party cannot withstand summary judgment by simply sitting mute and failing to challenge the authenticity, admissibility, or veracity of those documents. *See Leys v. Lowe's Home Ctrs., Inc.*, 664 F.Supp.2d 828, 831 (W.D.Mich. 2009) (Maloney, C.J.) (citing *Donoho v. Smith Cty. Bd. of Ed.*, 21 Fed.Appx. 293, 298 (6th Cir.2001) (Boggs, J.) (affirming summary judgment for employer, Circuit noted that plaintiff s "affidavit does nothing to challenge the evidence put forward by the defendants that the last IEP meeting ... also included provision to her of the apparently usual verbal and written notices of her rights.")).[2]

Moreover, the mere existence of an alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion; there be some genuine issue of *material* fact. *ARS*, 602 F.Supp.2d at 845 (citing, *inter alia, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). And the non-movant "cannot defeat a properly supported motion for summary judgment motion by 'simply arguing that it relies solely or in part upon credibility determinations.'" *Heggie v. Kuzma*, 2009 WL 594908, *10 (W.D.Mich. Mar. 6, 2009) (Maloney, C.J.) (quoting *Fogerty v. MGM Group Holdings, Inc.*, 379 F.3d 348, 353 (6th Cir.2004) (non-movant may not "have a trial on the hope that a jury may disbelieve factually uncontested proof")).

The court must accept the non-movant's factual allegations, *ACLU v. NSA*, 493 F.3d 644, 691 (6th Cir.2007) (concurrence) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)), *cert. denied*, 552 U.S. 1179, 128 S.Ct. 1334, 170 L.Ed.2d 59 (2008), and view the evidence in the light most favorable to the non-movant, giving it the benefit of all reasonable inferences. *Fox v. Eagle Dist. Co., Inc.*, 510 F.3d 587, 592 (6th Cir.2007) (Griffin, J.); *see also Patterson*, 551 F.3d at 445.

█ But the court considers its evidence only to the extent that it would be admissible at trial. *See Elliott Co. v. Liberty Mut. Ins. Co.*, —— Fed.Appx. ——, ——, 2009 WL 750780, *10 (6th Cir. Mar. 23, 2009) (Moore, *Clay*, Kethledge) (on appeal from grant of summary judgment, panel declined to consider extrinsic evidence which would not be admissible under applicable state contract law) (citation omitted);

---

**1.** However, "[a] *verified* complaint 'carries the same weight as would an affidavit for the purposes of summary judgment.'" *ACLU of Ky. v. Grayson Cty., Ky.*, 591 F.3d 837, 843 (6th Cir.), (J. McKeague, joined by D.J. Forester), *reh'g denied*, 605 F.3d 426 (6th Cir. 2010).

**2.** *See, e.g., SBA v. McDonald*, 1985 WL 13600, *1 (6th Cir. Aug. 15, 1985) (p.c.) ("Even assuming the checks and money orders were mailed, there is no genuine issue as to their receipt. McDonald offers nothing to dispute the sworn affidavit that payment was not received. Payment does not occur without receipt. Summary judgment was appropriate.");

*US v. One 1983 Mercedes Benz 380SL*, 1991 WL 276262, *6 (6th Cir. Dec. 20, 1991) ("[C]laimant's verified claim contains a sworn statement by the company's general manager '[t]hat at no time did A.D.E. have any knowledge or reason to believe that the property in which it claims an interest was being used or would be used in violation of the law.' The government has produced nothing to dispute the truth of that assertion. * * * The government has pointed to no facts that would entitle it to defeat A.D.E.'s claim, and A.D.E. is entitled to summary judgment ....");

*Bond v. Burson,* No. 96–5459, 134 F.3d 370, 1998 WL 24993, *4 (6th Cir. Jan. 16, 1998) ("The district court also acted within its discretion in denying plaintiff's motion to strike the Smith affidavit from defendants' summary judgment motion. By relying upon the affidavit only for the purposes of establishing the history of the case and DHS's custody of plaintiff, the court properly disregarded those facts not admissible at trial.").[3]

Ultimately, entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party w[ould] bear the burden of proof at trial." *Davison v. Cole Sewell Corp.,* 231 Fed.Appx. 444, 447 (6th Cir.2007) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548).[4] "As Chief Judge Bell has characterized the post-trilogy summary-judgment standard, '[w]hile preserving the constitutional right of civil litigants to a trial on meritorious claims, the courts are now vigilant to weed out fanciful, malicious, and unsupported claims before trial.'" *Ellis v. Kaye–Kibbey,* 581 F.Supp.2d 861, 874 (W.D.Mich.2008) (Maloney, C.J.) (quoting *Wilson,* 112 F.Supp.2d at 654); *see also Townsend v. US,* 2000 WL 1616081, *1 (W.D.Mich. Aug. 31, 2000) (McKeague, J.).

## LEGAL STANDARD:

## Federal Employers Liability Act and Federal Safety Appliance Act

■ Congress enacted FELA " 'in response to the special needs of railroad workers who are daily exposed to the risks inherent in railroad work and helpless otherwise to provide for their own safety.'" *Borger v. CSX Transportation, Inc.,* 571 F.3d 559, 563 (6th Cir.2009) (quoting *Aparicio v. Norfolk & Western Ry. Co.,* 84 F.3d 803, 807 (6th Cir.1996)). Generally, the Act requires railroad carriers to provide their employees with " 'a reasonably safe place in which to work and such protection' against the hazard causing the injury 'as would be expected of a person in the exercise of ordinary care under the circumstances.'" *Borger,* 571 F.3d at 563 (quoting *Aparicio,* 84 F.3d at 810 (quoting *Urie,* 337 U.S. at 174, 69 S.Ct. 1018)) (brackets omitted). This does not mean that the railroad has a duty to provide a workplace free of all dangers or risks, only that it must exercise reasonable care towards that end. *See Przybylinski v. CSX Transportation, Inc.,* 292 Fed.Appx. 485, 488 (6th Cir.2008) (J. Batchelder, joined by J. Griffin, with J. Kennedy dissenting on other grounds) (citing *Van Gorder v. Grank Trunk Western R.R. Inc.,* 509 F.3d 265, 269 (6th Cir.2007) (quoting *Baltimore & Ohio S.W. R. Co. v. Carroll,* 280 U.S. 491, 496, 50 S.Ct. 182, 74 L.Ed. 566 (1930))).

■ To recover under FELA, the injured railroad employee must show by a preponderance of the evidence that (1) he was injured within the scope of his employment for the railroad, (2) his employment was in furtherance of the company's interstate transportation business, (3) the company was negligent, and (4) the company's negligence "played some part in causing the injury" for which he seeks compensation. *Przybylinski* 292 Fed.Appx. at 488

3. *Accord ARS,* 602 F.Supp.2d at 845 (applying Michigan law) (citing *Healing Place,* 744 N.W.2d at 177 (citing MICH. CT. R. 2.116(G)(6) and *Veenstra v. Washtenaw Country Club,* 466 Mich. 155, 645 N.W.2d 643, 648 (2002))).

4. A trilogy of 1986 Supreme Court decisions "made clear that, contrary to some prior precedent, the use of summary judgment is not only permitted but encouraged in certain circumstances ...." *Collins v. Assoc'd Pathologists, Ltd.,* 844 F.2d 473, 475–76 (7th Cir. 1988). *Accord In re Fin. Federated Title & Trust, Inc.,* 347 F.3d 880 (11th Cir.2003) (the trilogy "encourage the use of summary judgment as a means to dispose of factually unsupported claims.");

(citing *Van Gorder,* 509 F.3d at 269 (citing *Green v. River Terminal Ry. Co.,* 763 F.2d 805, 808 (6th Cir.1985))).

*Elements 1 and 2 of FELA Liability are Uncontested.* To the extent that the railroad believes that Marshall suffered any new injuries, or exacerbated any existing injuries or medical conditions, on the dates of the four incidents, it does not deny that Marshall was acting within the scope of his employment when engaged in the conduct which *he* alleges caused or exacerbated the same. As for the second element, the railroad does not deny that that employment was in furtherance of its interstate transportation business. Therefore, the court finds that Marshall has established the second element of FELA liability as a matter of law. The court also assumes *arguendo,* for purposes of this motion only, that Marshall has satisfied the first element of FELA liability as a matter of law.

■ *Marshall Proffers Negligence Per Se as Method of Establishing Third Element of FELA Liability.* Assuming that the injured railroad employee has established the first two elements, he may establish the third element of FELA liability—negligence—as a matter of law if he proves that the railroad company violated a safety statute that imposes an absolute duty on the company, *Borger,* 571 F.3d at 563 (citing *Crane v. Cedar Rapids & Iowa City Ry. Co.,* 395 U.S. 164, 166, 89 S.Ct. 1706, 23 L.Ed.2d 176 (1969) and *Kernan v. American Dredging Co.,* 355 U.S. 426, 443, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958) and *Urie,* 337 U.S. at 163, 69 S.Ct. 1018). In other words, "[t]he FSAA do[es] not by [its] terms confer a right of action on injured parties." *Grogg v. Missouri Pacific R. Co.,* 841 F.2d 210, 212 (8th Cir.1988) (citing *Urie,* 337 U.S. at 188, 69 S.Ct. 1018). "Rather, * * * '... the FSAA provide[s] the basis for the claim, and the FELA provides the remedy.'" *Grogg,* 841 F.2d at 212 (quoting *Beissel v. Pittsburgh*

*& Lake Erie R.R.,* 801 F.2d 143, 145 (3d Cir.1986)).

If the employee cannot prove a violation of such a safety statute, he may establish FELA liability only by proving the traditional elements of a common-law negligence claim, namely the existence of a duty on the part of the company, breach of that duty, foreseeability, and causation, *Borger,* 571 F.3d at 563 (citing *Adams v. CSX Transportation, Inc.,* 899 F.2d 536, 539 (6th Cir.1990)).

Most broadly, the FELA states, in pertinent part as follows: "Every common carrier by railroad while engaging in [interstate] commerce ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... resulting in whole or in part from the negligence of [the common carrier]." 45 U.S.C. § 51. More pertinent to the injuries alleged here, the FSAA's General Requirements provision (49 U.S.C. § 20302(a)) states that, except as otherwise provided in the following section, a railroad carrier may use or allow to be used on its railroad lines

(1) A vehicle only if it is equipped with—

(A) couplers coupling automatically by impact, and capable of being uncoupled, without the necessity of individuals going between the ends of the vehicles;

(B) *secure sill steps* and efficient hand brakes; and

(C) secure ladders and running boards when required by the Secretary of Transportation, and, if ladders are required, secure handholds or grab irons on its roof at the top of each ladder;

(2) except as otherwise ordered by the Secretary, a vehicle only if it is equipped with secure grab irons or handholds on its ends and sides for

greater security to individuals in coupling and uncoupling vehicles;

(3) a vehicle only if it complies with the standard height of drawbars required by regulations prescribed by the Secretary;

(4) a locomotive only if it is equipped with a power-driving wheel brake and appliances for operating the train-brake system; and

(5) a train only if—

(A) *enough of the vehicles in the train are equipped with power or train brakes so that the engineer on the locomotive hauling the train can control the train's speed without the necessity of brake operators using the common hand brakes for that purpose;* and

(B) at least 50 percent of the vehicles in the train are equipped with power or train brake and the engineer is using the power or train brakes on those vehicles and on all other vehicles equipped with them that are associated with those vehicles in the train.

49 U.S.C. § 20302(a) (emphasis added).

 Our Court of Appeals has decided, in a precedential opinion, that the Federal Safety Appliance Act (FSAA) is the type of safety statute which imposes an absolute duty on railroads and whose violation therefore constitutes negligence *per se* for purposes of FELA's third element. In *Richards v. Consolidated Rail Corp.* 330 F.3d 428, 433 n. 2 (6th Cir.2003), the Circuit in a footnote cited *Urie,* 337 U.S. 163, 69 S.Ct. 1018, for the proposition that "the FSAA and BIA are substantially, if not in form, amendments to FELA; they dispense, for purposes of employees' suits, with [the] necessity of proving that violations of the safety statutes constitute negligence; [the] statutes should be read and applied together." *Richards* is clear precedent for this proposition. This conclusion

is consistent with *Kavorkian v. CSX Transportation, Inc.,* 117 F.3d 953 (6th Cir.1997), which referred to the FSAA as "a strict liability statute", 117 F.3d at 957 (citing *Norfolk & Western Ry. Co. v. Hiles,* 516 U.S. 400, 116 S.Ct. 890, 134 L.Ed.2d 34 (1996)), and adverted to "the venerable rule that a 'failure' of equipment 'to perform as required by the [F]SAA is itself an actionable dependent on neither negligence nor proof of a defect' ", *Kavorkian* 117 F.3d at 957 (quoting *Hiles,* 516 U.S. at 400, 116 S.Ct. 890, and citing *Affolder v. NY, Chicago & St. Louis R.R. Co.,* 339 U.S. 96, 98–99, 70 S.Ct. 509, 94 L.Ed. 683 (1950) and *O'Donnell v. Elgin, Joliet & Eastern Ry. Co.,* 338 U.S. 384, 385–86, 70 S.Ct. 200, 94 L.Ed. 187 (1949)). *Cf. Szekeres v. CSX Transportation, Inc.,* 617 F.3d 424, 427 (6th Cir.2010) (violation of the Locomotive Inspection Act, 49 U.S.C. § 20701, formerly the Boiler Inspection Act, constitutes negligence *per se* for purposes of a FELA claim) (citing *Mickler v. Nimishillen & Tuscarawas Ry. Co.,* 13 F.3d 184, 188 (6th Cir.1993) (citing *Urie v. Thompson,* 337 U.S. 163, 188–89, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949))); *Borger,* 571 F.3d at 563 (assuming, without deciding, that Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.,* was a safety statute whose violation would establish FELA liability as a matter of law without further proof of negligence).

## DISCUSSION

*Third of the Four Elements of FELA Liability.* Having concluded that Marshall has established the first two elements of FELA liability without contest from the railroad, the court considers whether the railroad has shown any genuine issue of material fact as to whether it violated the FSAA. If the railroad has not made such a showing, then Marshall will have established the third of the four elements of FELA liability as a matter of law.

To establish negligence through the strict-liability negligence *per se* method which obtains in FELA cases, Marshall need not prove that the railroad had actual or constructive notice of any defect in its equipment, only that the condition, placement, or usage of its equipment violated the FSAA. *See, e.g., Hoemmelmeyer v. CSX Transportation, Inc.,* 2005 WL 2124259, *5–6 (S.D.Ohio Aug. 30, 2005) (Sr. J. Spiegel) (denying defendant railroad's motion for summary judgment on FSAA-based FELA claim, and rejecting railroad's argument that employee needed to show that it had actual or constructive notice of the defect which constituted the alleged FSAA violation); *contrast Marando v. CSX Transportation, Inc.,* 2004 WL 1656634, *2–3 (E.D.Pa. July 23, 2004) (to prevail on FELA claim where plaintiff did *not* allege violation of FSAA or similar safety statute, plaintiff had to show that railroad had actual or constructive notice of the defect which underlay the railroad's alleged negligence, in that case the allegedly rotten, loose or weak steps of a wooden staircase and landing which led from plaintiff-yardmaster's office to the parking lot).

> As the Supreme Court has explained, when evaluating an FSAA claim, [p]roof of an actual break or visible defect in [a piece of railroad equipment] is not a prerequisite to a finding that the statute has been violated. Where a jury finds that there is a violation, it will be sustained, if there is proof that the mechanism failed to work efficiently and properly even though it worked efficiently both before and after the occasion in question. *The test in fact is the performance of the appliance. Efficient means adequate in performance; producing properly a desired effect. Inefficient means not producing or not capable of producing the desired effect; incapable; incompetent; inadequate.*

*Ehmann v. Norfolk Southern Corp.,* 241 F.3d 791, 795 (6th Cir.2001) (quoting *Myers v. Reading Co.,* 331 U.S. 477, 483, 67 S.Ct. 1334, 91 L.Ed. 1615 (1947)) (emphasis added).

Each of Marshall's four FELA claims (although not artfully drafted as to Count IV) relies on an alleged violation of a regulation which the Federal Railroad Administration has promulgated to implement the FSAA. The FRA is part of the DOT and is authorized to exercise the Secretary of Transportation's powers under certain safety statutes, *see* 49 U.S.C. § 103(a) and (g) and *Mayor & City of Baltimore v. CSX Transportation, Inc.,* 404 F.Supp.2d 869, 876 (D.Md.2005) ("The Secretary has delegated to the Federal Railroad Administration the authority to '[c]arry out all functions vested in the Secretary by the [FRSA]', with certain exceptions not applicable here.") (citing 49 C.F.R. § 1.49(m)). A regulation promulgated by the FRA to establish standards for compliance with a safety appliance act has the force of law and becomes, in effect, part of the statute itself. *See Gregory v. Missouri Pacific R. Co.,* 32 F.3d 160, 164 n. 8 (5th Cir.1994) ("a rule adopted in the exercise of the Interstate Commerce Commission's authority 'acquires the force of law and becomes an integral part of the [Boiler Inspection Act]' ") (quoting *Lilly v. Grand Trunk Western R Co.,* 317 U.S. 481, 488, 63 S.Ct. 347, 87 L.Ed. 411 (1943)); *Givens v. Missouri–Kansas–Texas R. Co.,* 195 F.2d 225, 229 (5th Cir.1952) ("A violation of any of [the] particular requirements promulgate [by the ICC] is a violation of the [BIA]"); *Mosco v. Baltimore & Ohio R. Co.,* 817 F.2d 1088, 1091 (4th Cir.1987) ("a carrier may violate the BIA in one of two ways. First, it may fail to comply with the regulations promulgated by the Federal Railroad Administration.").

■ COUNT ONE, RAILROAD'S ALLEGED VIOLATION OF FSAA's BRAKE–SYSTEM REQUIREMENT. Count one—which seeks damages for Marshall allegedly injuring his back and legs by being required to walk on steeply sloped ground for over a mile to check on a malfunctioning brake system—seeks to establish strict-liability through negligence *per se* by showing that the railroad violated the FSAA regulation at 49 C.F.R. § 232.103(c), which provides that "[a] train brake system shall respond as intended to signals from the train line", which is defined as "the brake pipe or any non-pneumatic system used to transmit the signal that controls the locomotive or freight car brakes", 49 C.F.R. § 232.5. Count one further relies on Marshall proving that the railroad violated Appendix B to Part 232 of 49 C.F.R., Specifications—General Requirements, Paragraph 17, which provides in pertinent part, "The apparatus conforming to the requirements of these specifications shall be so constructed, installed and maintained as to be safe and suitable for service."

Quite simply, Marshall reasons that the FSAA and the corresponding FRA regulations require the train's air-braking system to be working at all times; the railroad has not offered evidence to contradict his allegation that on January 11, 2007, the braking system malfunctioned and that the malfunction caused the emergency stop which led to his supervisor ordering him to walk on steeply sloped ground over a long distance to ascertain the source of the malfunction and fix it, P's MSJ at 13. "But for the failure of the train's braking system", Marshall contends, he "never would have been required to walk the length of his train in such conditions and would not have sustained injury", P's MSJ at 14.

As noted in the Background section, the railroad presents photographs—which Marshall does not deny are authentic and which he admits appear to depict the relevant section of ground alongside the track where the train made the emergency stop in Valparaiso, Indiana—from which a factfinder could find that the ground was not steeply sloped at all, and therefore that Marshall was not injured by walking on sharply sloped ground or if he was injured it was not "within the risk created by" the defective appliance. *Richards* at 437.

■ COUNTS TWO AND THREE, RAILROAD'S ALLEGED VIOLATION OF FSAA'S SILL–STEP REQUIREMENT. Counts two and three—which seek damages for injuries Marshall allegedly sustained as a result of collapsing sill steps on a railroad car on two occasions—seeks to establish strict-liability negligence *per se* by showing that the railroad violated 49 C.F.R. § 231.1(d)(4)(ii), which provides, in pertinent part, "Sill steps shall be securely fastened with not less than ½ inch bolts with nuts outside (when possible) and riveted over, or with not less than 1/2[-]inch rivets." Simply, Marshall alleges that it is undisputed that the sill steps at issue on February 1, 2006 and on September 13, 2007 were both broken and were not secured by bolts as required by regulation, P'S MSJ at 14–15. At least as to the sill step which collapsed under him on September 13, 2007, he introduces post-accident photos, *see* P's MSJ at 15 (citing Marshall Dep. 2's Ex. 8—photos a through h).

As noted in the background section, the railroad does not allege that it complied with the relevant FSAA regulation or deny that the sill steps collapsed underneath Marshall on both occasions; it merely suggests that he was contributorily negligent. Even if the railroad is permitted to raise contributory negligence as a defense to

liability in a FELA action predicated on an FSAA violation—a legal proposition which Marshall vigorously and perhaps persuasively contests—the court determines as a matter of law that the railroad has not presented evidence or argument from which a reasonable factfinder could find that Marshall did anything negligent in simply relying on the sill steps to support his weight in the ordinary conduct of business. **The court therefore finds that the railroad violated the FSAA by not maintaining and securing the sill steps which collapsed. Marshall will be entitled to summary judgment as to liability on counts two and three, if he can show there is no genuine issue as to whether the violation-occasioned collapse of the steps played at least some role in causing some injury to him.**

■ COUNT FOUR, RAILROAD'S ALLEGED VIOLATION OF FSAA'S BALLAST / TRACK–DRAINAGE REQUIREMENT. Count four—which seeks damages for injuries Marshall allegedly sustained as a result of slipping and falling on ice while operating a ground switch in or near a railyard on December 13, 2007—seeks to establish strict-liability negligence *per se* by showing that the railroad violated 49 C.F.R. § 213.103(c), which is entitled Ballast—General and provides, in its entirety, that "[u]nless it is otherwise structurally supported, all track shall be supported by material which will—* * * Provide adequate drainage for the track[.]" Marshall's theory is that the Kilgore Yard's mainline track structure was not properly ballasted with rock to allow proper drainage of precipitation, P's MSJ at 15–16, and he introduces post-accident photos taken by the railroad which he characterizes as showing "the accumulation of ice near the KK 11/12 switch stand where Plaintiff was required to stand and operate the switch", *see* Marshall Dep. 3's Ex. 11—photos b through d.

Marshall also proffers deposition testimony from civil engineer Raymond Duffy, who served as Chief Engineer for U.S. Properties for the defendant railroad from 1989 to 1997, is a member of the American Railway Engineering and Maintenance Association, served four years on the Association of American Railroads' engineering management committee, and has over thirty years of professional railway engineering experience through employment with "three Class I railroads", P's MSJ at 16 (citing Ex. 3 at 23 and 72). In support of Duffy's designation as an expert witness, Marshall further notes that while Duffy was employed by this railroad and by Con–Rail, he held the positions of Assistant Supervisor of Track, Supervisor of Track, Assistant Division Engineer, Division Engineer, Regional Production Engineer, Chief Regional Engineer, Assistant Chief Engineer, Chief Engineer for Communication and Signals, and Chief Engineer itself, *see* P's MSJ Ex. 3 (Duffy Dep)'s at 29–30 and its Ex. 7 (curriculum vitae). Duffy has experience ensuring that railroads comply with this very ballast regulation and the rest of the Track Structure provisions found at 49 C.F.R. § 213 *et seq.*

After reviewing post-accident photos and other evidence, Duffy opined that on that date at that location, the railroad failed to adhere to 49 C.F.R. § 213.103(c), *see* P's MSJ Ex. 3 (Duffy Dep) at 91–92. According to Marshall, Duffy reasons that the presence of ice on the ground at the switch stand "unquestionably proves that improper drainage occurred in the track structure at this location" P's MSJ at 17 (citing Ex. 3–Duffy Dep's Ex. 11 (photo)). Duffy had this exchange with counsel:

Q. * * * According to you, the purpose of ballast is to provide, among other things, drainage?

A. Adequate drainage for the track structure, yes.

Q. What is properly drained ballast?

A. The absence of water. Water to the track structure is like death to the track structure. It weakens it. In freezing conditions you can have frost heaves, which can affect the track, so it's absolutely necessary you have adequate drainage for the ballast.

\* \* \*

Q. That's why I don't understand the use of the phrase "properly drained ballast." That's what ballast *inter alia* is for, is to provide ballast?

A. You can have ballast in there that's not properly drained that would not be right.

Q. You can have ballast in there that's not properly drained, meaning it's not high enough?

A. It means it's the wrong size or the wrong composition.

Q. It's not doing one of its jobs, which is to provide drainage?

A. Correct.

P's MSJ Ex. 3 (Duffy Dep) at pp. 85–86. Marshall avers that the railroad's expert witness merely questions the *amount* of snow on the ground at the location of the switch stand, not the *presence of ice and snow there*, P's MSJ at 19. But this is not an accurate characterization of the railroad's position or of the record evidence.

The railroad's meteorological expert flatly rejects Marshall's recollection that it snowed 2–3 inches on the night of December 13, 2007 after the train departed Battle Creek, Michigan (and before it arrived at the Kilgore railyard where he allegedly slipped and fell on "ice under snow"), *see* P's April 22, 2010 Dep. at 94–96 and 113, and that the photographs of the scene did not accurately reflect the snow that was actually present and obscuring the alleged ice when he fell. The railroad's meteorologist opined that from his analysis of hourly surface meteorological conditions at the Kalamazoo airport (only one and a half miles from the Kilgore Railyard) and the Kellogg Airport in Battle Creek—and adhering to the methods and standards of the FAA, National Weather Service, and National Climactic Data Center—he found that anywhere from "a trace" to a maximum of three-tenths of an inch of snow fell in either Battle Creek (the train's origin) or Kalamazoo Airport (1.5 miles from the train's destination, where the alleged accident occurred) between 9:00 p.m. on December 12, 2007 and 7:00 a.m. on December 13, 2007. *See* Def's Opp. at 17–18 (citing Gross Affidavit, unspecified exhibit to P's MS J). Consequently, the railroad argues, there is at least a genuine issue as to whether there was any snow obscuring ice which allegedly caused Marshall to fall, which in turns creates a genuine issue as to whether Marshall could and should have seen whatever ice was on the ground by the switch and exercise care in walking on or near said ice, Def's Opp. at 18.

Alternatively, the railroad presents an affidavit by one of its Track Supervisors, James Gasiecki (Def's Opp. Ex. 8 dated January 24, 2011), which it contends creates at least a genuine issue as to whether with the FSAA ballast regulation even applied and, if it did apply, whether the railroad complied with the regulation with respect to that ground-switch location on that night. Marshall replies to Gasiecki's affidavit as follows:'

> [Track Supervisor] Gasiecki attests that the walking area around the switch where Plaintiff fell is not part of the track structure and as a result [is] not covered by 49 C.F.R. § 213.103(c). [n. 4 citing *Norris v. Central [of Georgia] R.R. Co.*, 208 [280] Ga.App. 792 [635 S.E.2d 179] (Ga.Ct.App.2006) without citation to a specific page or quotation of any particular language] This opinion is supported or "verified" by a conversa-

tion he had with an unidentified FRA track inspector (See Page ID # 721). Defendant cannot create a material issue of fact with inadmissable evidence. Mr. Gasiecki's opinion that 49 C.F.R. § 213.103 is not applicable to the location of Plaintiff's injury is clearly based on a hearsay conversation with an unnamed Federal Railroad Administration employee. Pursuant to FRE 801 and 802 such a statement is inadmissable and this portion of Mr. Gasiecki's affidavit should not be considered.

Mr. Gasiecki doesn't dispute the fact that there was ice present around the headblock ties at the switch stand involved. Mr. Gasiecki does not dispute that sufficient ballast up to the end of the ties would have drained the area of moisture[;], instead he attributes the accumulation of water around the switch to the footwork of employees attempting to operate said switch. Mr. Gasiecki claims that this footwork created a depression "which has the capacity to hold water." The existence of an explanation for the failure of the ballast to drain away the water cannot justify a violation of the regulation. Simply put, Mr. Gasiecki's affidavit ignores the plain language of 49 C.F.R. § 213.103(c) which requires that ballast provide adequate drainage for the track. The fact that ballast was worn down at this location because of foot traffic in connection with the operation of [the] KK11/12 switch is not a defense to Defendant's failure to comply with the CFR.

P's Reply at 6–7.

Defendant also points to asserted inconsistencies in Marshall's version of the event as to whether the absence of ballast had anything to do with the occurrence.

Given the state of the record, the court concludes that genuine issues of material fact exist precluding a finding of negligence per se violation of FSAA's Ballast/Track Drainage Requirement.

■ *Fourth Element of FELA Liability: Causal Connection Between Railroad's Alleged FSAA Violations and Marshall's Injuries.* The final question is whether the railroad has shown any genuine issue of material fact as to whether Marshall's injuries resulted at least "in part", *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), from its violations of the FSAA, i.e., that its violations of the FSAA do not have even "some causal connection" with Marshall's injuries, *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 503 (9th Cir.1994). In its entirety, Marshall's case-in-chief on the causation element reads as follows:

In this case, there is no issue that the underlying incidents caused "in whole or in part" Plaintiff's knee and back injuries. Regarding his knee injuries and need for surgery, his treating doctor stated that both the February 1, 2006 incident as alleged in Count III and the December 13, 2007 incident as alleged in Count IV were a cause of his underlying knee problems which led to surgery. (Exhibit 5, Deposition Dr. Stephen Kokmeyer, pp. 98–106). And, regarding his back injuries, treating physician Dr. David Brockman has testified that his slip and fall on December 13, 2007 aggravated a pre-existing condition in his back leading to injury. (Exhibit 6, Deposition of Dr. David Brockman, p. 90). In light of the foregoing, there can be no factual dispute that Plaintiff suffered injury as a direct result, in whole or in part, of GTW's violation of the FSAA and applicable sections of the Code of Federal Regulations cited above. While GTW may, and presumably will, dispute the magnitude or permanency of these injuries, this potential challenge goes not to the issue of causation of harm, but

rather to the measure of damages. There is no genuine issue of material fact with respect to causation and Plaintiff is entitled to judgment as a matter of law.

P's MSJ at 21–22. The railroad responds, however, that Marshall is mischaracterizing the testimony of his treating physicians Kokmeyer and Brockman, which it says do not support his confident statement about causation, see Def's Opp. at 3. On the contrary, the railroad argues, both the treating physicians' testimony and the testimony of Marshall's surgeons (Thomas and Schaefer) show that there is a genuine issue as to whether its alleged violations of the FSAA had any causal connection to his injuries, id.

*Dispute Over Import of Treating Physician/Surgeon Kokmeyer's Notes and Testimony.* Specifically, the railroad emphasizes that on January 24, 2005, thirteen months before the first accident at issue, at Marshall's first visit to Dr. Kokmeyer, he was already complaining to Kokmeyer that he had been having bilateral knee pain and problems "for quite some time"; "problems on and off with his knees for quite some time"; bilateral knee swelling and locking, pain which was aggravated when climbing or descending stairs, pain with sitting and kneeling, pain under both knees, and grinding under the patellas, see Kokmeyer Dep. (P's MSJ Ex. 5) at 12, 15–17, and Kokmeyer at that time found "fairly significant patellofemoral crepitance" in both legs, "palpable osteophytes in the distal femur" of both legs, and mild to moderate degenerative changes throughout the knees, especially around both patellofemoral joints, see Kokmeyer Dep. (P's MSJ Ex. 5) at 21 & 23. On deposition, Kokmeyer declined to affirmatively characterize the tri-compartmental osteo-arthritic changes in Marshall's knees which he observed in January 2005 as "advanced", but the railroad says he "did not take issue

with that diagnosis", Def's Opp. at 4 (citing Kokmeyer Dep. at 28).

Thirteen months later, after the first incident (February 1, 2006), Dr. Kokmeyer examined Marshall on February 10, 2006 and concluded that his symptoms and pain (locking of the knees, aggravation when climbing or descending stairs or kneeling, joint line tenderness, osteophytes, and crepitance) were the same as one year earlier, before any of the on-the-job incidents occurred, see Kokmeyer Dep. (P's MSJ Ex. 5) at 48–50.

On March 21, 2007—two months after the second alleged incident (January 11, 2007 collapse of sill step)—Marshall was examined by Dr. Kokmeyer but said nothing to the doctor about the January 11th incident or any problems with his back. Thereafter, Marshall visited Dr. Kokmeyer for Synvisc injections in March and April 2007 and otherwise did not see Kokmeyer for more than eight months, when he had a previously scheduled visit intended to review his "arthritis complaints" regarding his knees on December 13, 2007. *See* Def's Opp. at 5 (citing Kokmeyer Dep. at 60).

The railroad alleges that there is no record of any treatment related to the third incident, the sill-step collapse of September 13, 2007, Def's Opp. at 5.

At the December 13, 2007 examination— right after the fourth and final incident (slipping and falling on ice and/or snow while operating the ground switch at the Kilgore Yard)—Marshall told Dr. Kokmeyer that he had "wrenched" his left knee after slipping on ice, but again said nothing about his back; Kokmeyer diagnosed a strain of the medial collateral ligament, from which, the doctor opined, a patient would typically recover in about 6–10 weeks. *See* Kokmeyer Dep. (P's MSJ Ex. 5) at 62 and 65–66. Less than six weeks later, on January 21, 2008, Marshall re-

ported that his left knee was doing "reasonably well", Kokmeyer Dep. at 71–72, and on March 27, 2008 Kokmeyer ordered x-rays of Marshall's knees, which showed the same mild-to-moderate degeneration that he had seen in 2005, *id.* at 76–77. The railroad uses this evidence to argue that Marshall's knee complaints "Varied from visit to visit, as they had prior to the initial visit" in January 2005, before any of the incidents happened, *see* Def's Opp. at 5, implying that the incidents did not cause, contribute to, or exacerbate Marshall's knee problems.

On April 30, 2008, Dr. Kokmeyer performed a partial medial meniscectomy. Kokmeyer diagnosed "degenerative arthritis involving the patellofemoral joint to a pretty extreme extent with complete bone exposure on portions of the undersurface of the patella", but he also opined that the degenerative arthritis in the left knee was consistent with the impression he had already formed about both knees at their first exam back in January 2005, *see* Kokmeyer Dep. (P's MSJ Ex. 5) at 80 and 82). Significantly, Kokmeyer stated that he cannot say with any reasonable degree of medical certainty what caused the condition he observed in Marshall's left knee in April 2008, nor what caused the moderate-to-severe degenerative changes in medial femoral condyle and medial tibial plateau (together part of the medial compartment), *see* Kokmeyer Dep. at 83–84. Additionally, as to the "tear involving the posterior horn of the medial meniscus" noted in Kokmeyer's post-operative report for the April 30, 2008 knee surgery, the doctor stated that he could not say to any reasonable degree of medical certainty what had caused that tear, and he admitted that such tears can be caused by degeneration, *see* Kokmeyer Dep. (P's MSJ Ex. 5) at 8 and 85.

On June 4, 2008—five weeks after the operation on Marshall's left knee—Mar-

shall reported being "extremely happy" with that knee and "back to pretty much normal activities" with that knee, *see* Kokmeyer Dep. at 9. He did complain again about his right knee, but Kokmeyer found those complaints to be consistent with the complaints about that knee back in 2005 (before any of the on-the-job incidents), and he returned Marshall to work on June 23, 2008, *see* Kokmeyer Dep. (P's MSJ Ex. 5) at 10 and 87–88 and 90–91 and 105.

Dr. Kokmeyer could not say, with a reasonable degree of medical certainty, what caused the conditions which necessitated the replacement of Marshall's knees, *see* Kokmeyer Dep. (P's MSJ Ex. 5) at 97–98. Undermining Marshall's position on causation more substantially with regard to the knee injuries, Dr. Kokmeyer testified that he injected Marshall's knees because of arthritis (i.e., not because of some trauma caused by the sill-step collapses or the ice fall), and that he did *not* perform the April 2008 left-knee surgery because of the first three incidents (February 2006, January 2007, and September 2007), *see* Kokmeyer Dep. (P's MSJ Ex. 5) at 106–109. As to the fourth incident (the December 2007 slip on the ice and/or snow), Dr. Kokmeyer testified that it had caused merely "a different character of pain", which the partial meniscectomy eliminated, returning Marshall to the 2005 baseline, *see* Kokmeyer Dep. at 110–111. Based on this testimony, the railroad contends that Marshall has no basis for his claim that "his treating doctor stated that" he February 2006 and December 2007 incidents "were a cause of his underlying knee problems which led to surgery . . .", Def's Opp. at 7 (quoting P's MSJ at 21 (purporting to rely on Kokmeyer Dep. at 98–106)).

*Dispute Over Import of Treating Physician/Surgeon Brockman's Notes and Testimony.*

The railroad vigorously disputes Marshall's characterization of treating physi-

cian Dr. David Brockman's notes and testimony, as well. With regard to the fourth and final incident, Marshall claims that "regarding his back injuries", Brockman "has testified that his slip and fall [on ice or snow] on December 13, 2007 aggravated a pre-existing condition in his back leading to injury ...." P's MSJ at 21–22 (citing P's MSJ Ex. 6—Brockman Dep. at 90). The railroad counters that Dr. Brockman made no such unequivocal statement about causation. Rather, as revealed by the ver same page of Brockman's deposition cited by Marshall, Brockman testified only that the December 13, 2007 fall "could have" aggravated or "stirred up" arthritis at the L5/S1 joint (between the lumbar and sacral portions of the spine). Making much of the fact that Marshall cites only one page of Dr. Brockman's 104–page deposition transcript, the railroad proffers a host of testimonial statements by Brockman which it contends undermine Marshall's causation argument:

1. The MRI of January 19, 2007 of plaintiff's lumbar spine (eight da[y]s after the alleged January 11, 2007 "Valpo Hill" incident) showed "mild multi-level spondyloarthritic changes predominantly at the L4–L5 and ... osteophytes ..." which occur over months or years. [P's MSJ Ex. 6—Brockman Dep. at 11]

2. Those changes demonstrated on the January 19, 2007 MRI did not occur in the eight days between the January 11, 2007 and the MRI. [P's MSJ Ex. 6—Brockman Dep. at 11]

3. Those changes are not unusual for a 55 year old man, like plaintiff. They are degenerative changes from wear and tear, as well as age, genetics, activities, and body habitus. [P's MSJ Ex. 6—Brockman Dep. at 11–12]

4. The MRIs of January 19, 2007 and January 26, 2008 (after the fourth alleged incident of January 13, 2007) are basically the same. [P's MSJ Ex. 6—Brockman Dep. at 17]

5. When Dr. Brockman first saw plaintiff on March 6, 2008, the only back injury plaintiff described was the January 11, 2007 "uneven walking" incident. [P's MSJ Ex. 6—Brockman Dep. at 31]

6. Plaintiff told Dr. Brockman he was doing well until December 13, 2007. [P's MSJ Ex. 6—Brockman Dep. at 31]

7. At the initial consult on March 6, 2008, after Dr. Brockman took a history, did a physical exam, and reviewed the MRI, he diagnosed "slip and fall, secondary lumbar and gluteal strain and contusions." Based on his education, training and experience, he would expect a person with that diagnosis to recover, with appropriate care, in six to eight weeks. [P's MSJ Ex. 6—Brockman Dep. at 40–41]

8. At the April 25, 2008 consult, plaintiff told Dr. Brockman that his right knee condition was not associated with the December 13, 2007 incident. [P's MSJ Ex. 6—Brockman Dep. at 48–49]

9. Based on his review of plaintiff MRIs of his lumbosacral spine dated January 19, 2007 and January 26, 2008, Dr. Brockman opined [that] they showed facet joint arthritis, which are degenerative changes, not [damage] from the December 13, 2007 incident. These changes predate the December 13, 2007 incident. [P's MSJ Ex. 6—Brockman Dep. at 50–52]

10. The MRI findings relate to the right side and, therefore, do not correlate to plaintiff s left-sided

complaints. [P's MSJ Ex. 6— Brockman Dep. at 53]

11. The May 19, 2008 consult note repeats Dr. Brockman's opinion that "the patient's MRI x2 showed most pathology on the right side, which is now his asymptomatic leg." As of that date (May 19, 2008), Dr. Brockman concluded that plaintiff's "lumbar and gluteal contusion" had resolved.

As of May 19, 2008, Dr. Brockman reported that "there is no objective evidence that (plaintiff) has SI joint dysfunction other than his complaint of pain." Dr. Brockman also reported that there is "No convincing evidence of neurologic deficits." [P's MSJ Ex. 6—Brockman Dep. at 52 & 57–59]

12. Dr. Brockman reported that the physical therapist to whom he referred plaintiff discharged plaintiff on June 10, 208, with all goals met, including return to work. Dr. Brockman signed the discharge summary. [P's MSJ Ex. 6—Brockman Dep. at 63–64]

13. Dr. Brockman would have allowed plaintiff to return to work on June 5, 2008. [P's MSJ Ex. 6—Brockman Dep. at 73–74]

14. Dr. Brockman opined that he could not explain plaintiff s symptoms, that the MRIs, EMG, and the physical exams do not support plaintiff's complaints. He admitted that plaintiff's involvement in litigation could be a reason for his complaints. [P's MSJ Ex. 6—Brockman Dep. at 85–86]

The railroad also proffers the written opinion of its medical expert, Walter Braunohler, to the following effect:

1. Other than the torn medial meniscus in Marshall's left knee, which was treated surgically in April 2008, there is no evidence of pathologic deterioration in either knee related to any of the work incidents in 2006 and 2007.

2. Marshall's need for the knee replacements was not related to the work incidents because he had many knee problems prior to "these relatively minor" injuries. *The medial meniscus tear of his left knee which necessitated arthroscopic surgery was the only work-related injury.*

3. Marshall's knee replacements were related to his pre-existing degenerative processes.

4. The bulging discs are indicative of underlying disc disease and are not related to the January 2007 Valparaiso incident. He should have recovered from that incident within 3–6 weeks.

5. Marshall should have recovered from the December 2007 fall-on-the-ice incident within 3–6 weeks. His sciatica is related to his underlying degenerative disc disease.

6. Marshall's present condition was inevitable and would have occurred regardless of the work-related incidents.

Def's Opp. Ex. 5–Affidavit of Walter M. Braunohler ("Braunohler Aff").

**The question, then, is whether a reasonable factfinder, in light of the expert medical opinion and medical evidence submitted, could find that even if the railroad violated the FSAA, said violation(s) did *not* even in part cause any of Marshall's injuries. With one exception, it appears that this record would permit a reasonable factfinder to make that finding, which would prevent Marshall from holding the railroad liable under FELA on a strict-liability negligence *per se* theory. That possible exception is this:** the railroad's own medical

expert, Braunohler, opined that the medial meniscus tear of Marshall's left knee, which necessitated arthroscopic surgery, was "the only work-related injury", which seems necessarily to mean that it was a "work-related injury", i.e., caused by Marshall's engagement in his work for the railroad at the time of one of the accidents. Reading Braunohler's testimony in this rather straightforward fashion, there would be no genuine issue as to whether the railroad's violation of the FSAA played some role in causing that particular injury: according to the railroad's own expert, it did. *See also* P's Reply at 7–10.

### ■ CAN THE RAILROAD RAISE MARSHALL'S CONTRIBUTORY NEGLIGENCE?

FELA limits a railroad-employer's right to raise contributory negligence as a defense: the fact that the employee may have been guilty of contributory negligence shall not bar recovery, but damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee. Provided, That *no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.* 45 U.S.C. § 53 (emphasis added). Section 53's bar on consideration of contributory negligence extends not only to cases where the railroad violated an employee-safety *statute,* but also to cases where railroad violated an employee-safety *regulation. See Walden v. Illinois Central Gulf Railroad,* 975 F.2d 361, 364 (7th Cir.1992). Marshall's opening brief (P's MSJ at 19–20) points to *Jarrett v. CSX Transportation, Inc.,* No. 1:2008–cv–290, 2008 WL 4239148 (N.D.Ohio Sept. 10, 2008) (James S. Gwin, J.) (granting plaintiff's summary-judgment motion for an order holding rail-

road strictly liable under FELA due to violation of Locomotive Inspection Act regulation, 49 C.F.R. § 229.119(c), which required that floors of cabs, passageways, and compartments be kept free of any obstruction or waste which creates a slipping or tripping hazard).

On this record, however, the court need not decide the legal issue of whether the railroad may nonetheless raise contributory negligence as a defense to FELA liability. *See* Def's Opp. at 20–23 (arguing that the jury may decide whether the employee's conduct was the "sole proximate cause" of the injuries, in which case the employer-railroad cannot be held liable under FELA for those injuries). As to count one, the railroad has not suggested that Marshall was negligent in any way with regard to his walking alongside the track in Valparaiso, Indiana on January 11, 2007. (It is for a different reason, discussed above, that Marshall is not entitled to summary judgment on count one: there is a genuine issue of material fact as to whether the ground was steeply sloped as Marshall alleges, which means that a reasonable factfinder could reject Marshall's most fundamental, essential factual premise and his version of events pertaining to count one.)

As to counts two and three, as a matter of law the railroad has not presented any evidence or argument which would allow a factfinder to find that Marshall was negligent in merely placing his weight in the customary fashion on the railcar' s sill steps in the expectation that the steps would support his weight rather than collapsing.

As to count four, the railroad has presented no evidence or argument from which a factfinder could reasonably find that Marshall was negligent in some way that contributed to his alleged slip and fall. In addition, there is a genuine issue wheth-

er such negligence was "the sole proximate cause" of his slip-and-fall and any consequent injuries.

**Fourth Element of FELA Liability: Any Causal Connection Between FSAA Violation (or other Negligence by Employer) and Any Injury of Plaintiffs**

*Count One, Injured from Walking Long Distance on Sharply Sloped Ground.* As discussed above, for reasons unrelated to the adequacy of proof that some FSAA violation can be causally tied to some injury which Marshall sustained, Marshall is *not* entitled to summary judgment as to liability on count one (which seeks recovery for injuries allegedly sustained while walking on ground which Marshall alleges was very steep, but which a jury could find was not steep at all). Accordingly, this court need not reach this element of Count One in the context of this summary judgment motion.

*Counts Two and Three: Collapsing Sill Steps.* As discussed above, there is no genuine issue that the railroad violated the FSAA's sill-step regulation, that the sill steps therefore collapsed under Marshall on two occasions, and that (even if the railroad were permitted to raise contributory negligence as a defense to liability) there is no record evidence that Marshall did anything that could reasonably be considered contributorily negligent as to the collapse of the steps. **Marshall is entitled to summary judgment on the sill-step claims (counts two and three), but there is a genuine issue as to whether the collapse of the steps played** *some part* **in causing** *some injury* **to him.** Marshall points to his deposition testimony that when the sill step broke on February 1, 2006, the resulting impact caused his knees to be painful all the time thereafter, *see* P's Dep. 1 at 178–179; to treating physician Dr. Kokmeyer' s opinion that that incident caused a contusion to both knees, *see* P's MSJ Ex. 5 at 104–105; sur-

geon Thomas's opinion that "these injuries of 2006 are probably additional contributing factors that added to the progression of symptoms of pain in his knee", *see* Def's Opp. Ex. 11 (Dr. Thomas's letter) and Def's Opp. Ex. 14 (Dr. Thomas's Dep) at page ID # 1126;d and Thomas's opinion that the "direct blow onto the kneecaps" on February 1, 2006 "certainly would indicate that he could have damaged his cartilage further causing the more rapid progression" and "it's more likely that it would have caused his arthritis to go faster than not", P's Reply at 9–10. However, defendant, at oral argument and in briefing, sufficiently supports its argument that the treating physicians' and surgeons' testimony, and its expert medical testimony, create a genuine issue of material fact as to which injuries, if any, were at least in part caused or exacerbated by Marshall slipping on. ice and falling while operating the ground switch.

*Count Four: Alleged Slip and Fall on Alleged Ice While Operating a Ground Switch.* The disposition here is the same as Counts 2 and 3 above.

## ORDER

Plaintiff's motion for summary judgment on the issue of liability [doc. # 65] is **GRANTED in part** and **DENIED in part** as follows:

— The plaintiff's motion is **DENIED as to count one.** After trial, the jury or other factfinder will decide whether the defendant is liable under FELA on count one.

— The plaintiff's motion is **GRANTED as to counts two and three:** the defendant is liable under the Federal Employers Liability Act for any and all injuries sustained by the plaintiff which the collapse of the sill steps on February 1, 2006 and/or the collapse of the sill steps

on September 13, 2007 played any role in causing. At trial, the jury or other factfinder will determine the nature and extent of the injuries which said collapses caused, *see Spade v. CSX Transportation,* No. 5:2002–cv–129, 2004 WL 2980740, *4 (W.D.Mich. Jan. 30, 2004) (Gordon Quist, J.), and will determine the amount of appropriate damages therefor.

— The plaintiff's motion is **GRANTED as to count four.** The Defendant is liable under the Federal Employers' Liability Act for any and all injuries sustained by the Plaintiff which his slipping on ice near the KK 11/12 ground switch on December 13, 2007 played any role in causing. At trial, the jury or other fact finder will determine the nature and extent of the injuries which said collapses caused, and will determine the amount of appropriate damages therefor.

■ This is not a final and immediately-appealable order. *See Rochester Midland Corp. v. Enerco Corp.,* 2009 WL 1561817, *20 (W.D.Mich. June 1, 2009) (Maloney, C.J.) (order denying motion for summary judgment is not a final order, whether based on legal or factual grounds) (citing *Settembre v. Fid. & Guar. Life Ins. Co.,* 552 F.3d 438, 441–42 (6th Cir.2009) (Kethledge, J.) (dismissing, for lack of jurisdiction, an appeal from district court's reversal of bankruptcy court's grant of summary judgment)).